# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-1510V**

| | |
|---|---|
| LINDA PADOVA, *as Executor of the Estate of* GIROLOMO PADOVA, *Deceased,*<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: October 7, 2026 |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Dorian Hurley, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION DISMISSING PETITION[1]

On September 26, 2024, Linda Padova filed this action seeking compensation under the United States National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.* (the "Vaccine Program").[2] ECF No. 1. Petitioner alleges that her husband Girolomo Padova, suffered Guillain-Barré syndrome ("GBS") leading to his death, after receiving a form of seasonal influenza ("flu") vaccine (trademarked as "Fluad") in the United Kingdom on September 30, 2022. *Id.* The case was assigned to the Special Processing Unit in November 2024. ECF No. 9.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Because the vaccine was not administered within the United States, Petitioner's receipt of it must meet certain exceptions defined in the Vaccine Act in order for the claim to proceed. *See* Section 11(c)(1)(B)(i)(III). Respondent disputes Petitioner's showing that "the vaccine was manufactured by a vaccine manufacturer located in the United States" (*id.*), and I therefore ordered the parties to brief the issue.[3] After consideration of both sides' arguments, I conclude that Petitioner has not met her burden of establishing the exception for vaccines administered abroad, and therefore the claim must be dismissed.

## I. Fact History

The fact summary set forth below addresses only those matters relevant to the vaccine's administration and the claim's potential eligibility for the Vaccine Program, and thus does not address issues specific to causation or satisfaction of Table elements.

Mr. Padova was a U.S. citizen by birth, and he primarily resided in the U.S. at all relevant times. Ex. 3; Ex. 2 at ¶¶ 8, 11. He was visiting the U.K. when he received the at-issue vaccine on September 30, 2022. Ex. 1 at 4; Ex. 2 at ¶ 8. The Fluad formulation is one of three flu vaccines that are preferentially recommended for people 65 years and older. Although it is an inactivated influenza (flu) vaccine, like the majority of flu vaccines administered in the U.S., it uncommonly contains an adjuvant (an ingredient added to boost the immune response).[4]

About three days after receiving the vaccine, Mr. Padova traveled to Portugal. Ex. 2 at ¶ 8. On or about October 18, 2022, he was admitted to a Portuguese hospital, where he was diagnosed with GBS and received medical care including IVIg, intubation, and mechanical ventilation. *See generally* Ex. 5. On October 30, 2022, Mr. Padova was subsequently transported via air ambulance from Portugal to the U.S. Ex. 5 at 9, 29; Ex.

[3] Order to Show Cause dated May 30, 2025 (ECF No. 17); Petitioner's Response to the Court's Show Cause Order dated Oct. 31, 2025 (ECF No. 23) ("Brief"); Respondent's Response to Brief dated Dec. 30, 2025 (ECF No. 24) ("Opp."); Petitioner's Reply Brief, dated Jan. 29, 2026 (ECF No. 25) ("Reply").

[4] The parties do not dispute that the vaccine Mr. Padova received is "covered" under the Program, despite the fact that it is a form of flu vaccine not recommended for children, and (unlike the majority of flu vaccines administered in the U.S.) contains an adjuvant as well. For other covered vaccines, the absence or presence of an adjuvant or conjugate (which can serve the same immune-boosting purpose) can make the difference in whether the vaccine is covered. *Bundy v. Sec'y of Health & Hum. Servs*., No. 12-769V, 2014 WL 348852 (Fed. Cl. Spec. Mstr. Jan. 8, 2014); *Morrison v. Sec'y of Health & Hum. Servs.*, No. 04-1683V, 2005 WL 2008245 (Fed. Cl. Spec. Mstr. July 26, 2005). But because the Table only speaks of "seasonal" flu vaccines, and because Fluad appears to be seasonally-adjusted, it is reasonably deemed a covered vaccine despite its otherwise narrowly-intended application. 42 C.F.R. § 100.3(a)XIV (Table entries related to seasonal influenza vaccines); https://www.cslseqirus.us/news/seqirus-receives-fda-approval-for-fluad-quadrivalent-for-adults-65-years-and-older (last visited Oct. 6, 2026) (showing Fluad is a seasonal flu vaccine).

7 at 8. He received further medical care for GBS and its complications at U.S. inpatient facilities until his death on June 1, 2023. *See generally* Exs. 7, 9. The certified causes of death were GBS, pneumonia, and hypertension. Ex. 3.

## II. Status of Fluad Manufacturer

Highly relevant to my determination are facts specific to the vaccine dose Petitioner received abroad: who "manufactured" it, where this occurred, and the contacts of that entity with the United States.

The parties agree that the vaccine dose at issue was not administered in the U.S. Ex. 1 at 1, 3-4; Ex. 2 at ¶¶ 3, 5, 8. A sticker on the vaccination administration record indicates that the vaccine was an "Adjuvanted Quadrivalent Influenza Vaccine (Surface Antigen, Inactivated) Seqirus 2022/2023 Season" with lot number 4406C1A and an expiration date of April 2023. Ex. 1 at 4. "Seqirus" refers to a multinational corporate group, "CSL/Seqirus." Brief at 2.[5] Seqirus UK Limited ("SUK") is the "global intellectual property owner and 'entrepreneur' for Fluad, responsible for the overall supply chain, product ownership, and distribution to other Seqirus entities and third-party markets. Brief at 7. Another U.K. subsidiary of Seqirus is "Seqirus Vaccines Limited" ("SVL") *Id.* And Seqirus has a U.S. subsidiary as well. *See* https://www.csl.com/we-are-csl/worldwide-locations (last visited Oct. 5, 2026); CSL Annual Report 2023/24, available at https://www.cslseqirus.us/-/media/shared/documents/annual-report/csl-annual-report-2024.pdf at 146-48 (last visited Oct. 5, 2026).

It has further been substantiated that the flu vaccine dose Mr. Padova received in September 2022 was *solely* manufactured, produced, and/or distributed in "the U.K. and Spain, under the oversight of SVL or SUK, entities located and incorporated in the United Kingdom." Opp. at 5; *accord.* Brief at 7-13; Reply at 22-23.[6] SVL acted as the "limited risk manufacturer," while "SUK acted as the entrepreneur and market distributor in the United Kingdom." Opp. at 5 (citing Ex. 12 at 8, 11). Specifically, "SVL was responsible for all antigen production and formulation with the proprietary adjuvant MF59 in Liverpool, England." Opp. at 5 (citing Ex. 12 at 6, 8, 11; Ex. 13 at 1-3). "Doses of the vaccine … that were eventually distributed to markets in the United Kingdom were then filled, finished, and packaged in Liverpool, England or by a CMO in Rovi, Madrid, Spain." Opp. at 5 (citing

---

[5] *See also* Ex. 11 at 3 (providing that CSL Limited (ASX:CSL) includes Seqirus, which is "one of the largest influenza vaccine providers in the world… [w]ith state-of-the-art production facilities in the U.S., the U.K., and Australia").

[6] Although the parties' positions regarding the requirements of Section 11(c)(1)(B)(i)(III) differ, their descriptions of the manufacturing, production, and distribution system employed by Seqirus - including the evidence produced via subpoena by Seqirus (Exs. 12-18) - align. *Compare* Brief at 7-13; Reply at 22-23 *with* Opp. at 5-6. Thus, in some instances I only cite one party's filings on a specific point.

Ex. 12 at 6; Ex. 13 at 2-3). For Fluad vaccine doses bound for markets in the United Kingdom, product release ("a pharmaceutical manufacturing step in which the manufacturer confirms that the finished product meets testing and product specifications") happened in Liverpool, England. Opp. at 5. Fluad vaccine doses distributed in the United States and other locations have distinguishable distribution and production processes. *See* Opp. at 5-6 (citing Ex. 12 at 7-11; Ex. 13 at 3); Brief at Reply at 22.

Accordingly, the U.K. is the physical situs of "bulk antigen" and adjuvant production for *all* Fluad vaccines, for sale throughout the entire world, and the place where final steps (e.g., "fill finish," packing, and quality assurance) for Fluad vaccine doses bound for U.K. and European markets are completed. Brief at 9; *see also* Reply at 22 (confirming that Mr. Padova's Fluad vaccine dose followed this typical "U.K. market" production pathway). Nothing about the vaccine dose in question "touched" the U.S., beyond the fact that a U.S. citizen received it while abroad.

This does not mean, however, that Seqirus itself has no U.S. contacts. A different Seqirus subsidiary - Seqirus USA Inc., located in North Carolina - operates a facility performing fill-finish and packing of Fluad batches intended for use in U.S. and Canadian markets. Brief at 8 (citing Ex. 12 at 6-7). The U.S. facility is apparently capable of manufacturing the proprietary adjuvant, if needed for supply flexibility. Brief at 9 (citing the declaration[7] of a "Senior Director for Supply Chain Global Planning" for Seqirus, based in North Carolina - Ex. 13).

Seqirus USA Inc. also serves as "headquarters for Northern Hemisphere operations, handling regulatory oversight and distribution for the [U.S.] and other North American markets." Brief at 23. And Seqirus USA Inc. "holds the *U.S.* license, regulatory responsibility, and *excise-tax liability for FLUAD.*" *Id.* (emphasis added). However, Petitioner has not submitted any evidence of Seqirus USA Inc.'s contributions to the Vaccine Trust Fund (and it would reasonably seem that any such contributions would only be related to vaccine doses that are taxable, e.g, with a direct nexus to the U.S. – meaning doses that were *administered* in the U.S. or at least produced in the U.S. for use elsewhere).[8]

[7] Both declarations provided by this individual are signed under penalty of perjury pursuant to 28 U.S.C.A. § 1746. Ex. 13 at 2, 4-5.

[8] *See* 26 U.S. §§ 4131, 4132 (imposing excise taxes on covered vaccine doses that are manufactured, produced, consumed, used, or stored within the U.S.).

## III. Parties' Arguments

*Petitioner*

Petitioner contends that the claim legitimately arises within the Vaccine Program, and that she can satisfy the requirement of proving the Fluad vaccine dose Mr. Padova received was "manufactured by a vaccine manufacturer located in the United States" (Section 11(c)(1)(B)(i)(III)), allowing the matter to proceed even though the vaccine was not administered in the U.S. Brief at 35; Reply at 3, 26-27.

Petitioner disputes that the statute requires proof that is vaccine *dose-specific* – meaning evidence that the literal dose in question itself meets the test. Reply at 4-5. Instead, she contends she need only establish a relevant vaccine manufacturer's "place of business or corporate location" within the U.S. Brief at 18 (emphasis in the original). She argues that this approach is consistent with the statutory text and grammatical structure (most directly requiring "*a vaccine manufacturer located in the United States*"). Brief at 22.

Petitioner also argues that the term "manufacturer" should be construed broadly – extending to a corporate entity doing business in the U.S., holding an FDA license, and contributing to the Vaccine Trust Fund in connection with at least *some* doses of a covered vaccine (regardless of where the dose in question was manufactured). "Manufacturer" should also encompass the U.S.-based entity's global parent company. Brief at 22-23.[9] And Petitioner further argues – without any corroboration – that Congress knowingly "legislated against the backdrop of an industry in which vaccine manufacturing and distribution commonly occurred across national borders rather than within a single country…" Reply at 8 n.1.

This broad interpretive approach in construing the questions of manufacturer/manufactured, Petitioner argues, is consistent with Congress's aims of safeguarding the U.S. vaccine market, promoting U.S. public health, and allowing fair recourse to all Americans who happen to receive covered vaccines while temporarily visiting foreign countries – without requiring those Americans to navigate vaccine "supply-chain happenstance." Brief at 28.

[9] Citing Section 33(3) (The term '*manufacturer*' means any corporation, organization, or institution, whether public or private (including Federal, State, and local departments, agencies, and instrumentalities), which manufactures, imports, processes, or distributes under its label any vaccine set forth in the Vaccine Injury Table… The term '*manufacture*' means to manufacture, import, process, or distribute a vaccine.").

Relying on the foregoing, Petitioner argues that Seqirus USA Inc.'s U.S. location, plus U.S. forum activities relating to *some* Fluad doses, are sufficient to fulfill Section 11(c)(1)(B)(i)(III) – regardless of whether there is any *direct* connection between Seqirus USA Inc. and the specific dose received by Mr. Padova. Brief at 22-23.

On Reply, Petitioner addresses a decision seemingly dispositive of this issue - *Horowitz v. Sec'y of Health & Hum. Servs.*, No. 23-15V, 2024 WL 3665963 (Fed. Cl. Spec. Mstr. June 26, 2024) (dismissing claim regarding a hepatitis B vaccine received in Australia). In *Horowitz,* I rejected the assertion that a petitioner need "only establish[] that the manufacturer had a 'significant presence' in the U.S." 2024 WL 3665963, at *2. Instead, I determined a petitioner must prove "that the source of the vaccine was domestic in some fashion—both to ensure the Act's funding tax process has not been circumvented, but also so that only those manufacturing entities intended to benefit from the Program's civil liability protections do so." *Id.* at *5.

Petitioner, however, maintains that *Horowitz* is distinguishable, because in that case less of a nexus with U.S.-based vaccine manufacturer had been shown. *See generally* Reply at 9-12. She insists that *Horowitz* also did not consider that Respondent's proposed strict application of Section 11(c)(1)(B)(i)(III) would create disparately unfair results – for instance, *barring* a claim concerning a Fluad vaccine dose that was completely produced and administered in the U.K. to an American (like Mr. Padova) – while *allowing* a claim for an "identical" vaccine that was merely filled and finished in the U.S., for example, but then administered in Canada to another American. Reply at 12-13, citing Opp. at 18.

*Respondent*

Respondent maintains that Section 11(c)(1)(B)(i)(III)'s requirements are not met. He contends that the Vaccine Act's text must be interpreted narrowly, with any ambiguity construed in favor of the United States as sovereign. Opp. at 8-9. He suggests that the usage of the term "*the* vaccine"[10] in the language of the relevant administration situs exception reflects a focus upon the specific vaccine dose, as opposed simply to the organizational locus of its manufacturer – and thus the dose should have been *manufactured* by a vaccine manufacturer located in the U.S. if the claim is to meet the terms of this exception. *Id.* at 9-10 (citing *Horowitz*, 2024 WL 3665963, at *5). 13 (reiterating that "the evidence must be specific to the Fluad vaccine that Mr. Padova received, and not to Fluad vaccines generally.)" But Mr. Padova's Fluad vaccine dose

[10] Opp. at 9 (comparing that article to Sections 11(c)(1)(A) and (B)(i) - requiring receipt of "*a* vaccine set forth in the Vaccine Injury Table") (emphasis added)).

was in no sense "manufactured" physically within the U.S., "manufactured by" Seqirus USA Inc., or shown to have been taxed to fund the Program (meaning that damages potentially payable to Petitioner in this case would not have any nexus with the vaccine dose at issue). *Id.* at 11, 13. Rather, it was in all relevant senses produced by SUK/SVL. *Id.* at 13.

Respondent also opposes construing "vaccine manufacturer" in a way that "improperly conflates corporate entities" – here, collectively including Seqirus USA Inc. (the U.S.-based manufacturer of *some* Fluad doses intended for the U.S. and Canadian markets) plus the CSL/Seqirus corporate parent and wider global group. Opp. at 11-13, 14. Such a broad application is not required by the statute, supported by any legislative history, or consistent with common law principles. *Id.* at 14-15; *see also id.* at 14 n.4 (citing *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) ("[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries")).

Respondent otherwise maintains that Congress intended to limit the Vaccine Act's exceptions for covering "extraterritorial" vaccination, since such instances are less connected to *domestic* public health, the *domestic* vaccine supply, and the Act's funding structure. Opp. at 15-16. It would effect an absurdity to permit Program jurisdiction over flu vaccines wholly manufactured and sold in another country with different production standards not necessarily congruent with U.S.-based regulations, merely because a related corporate entity also manufactures and sells other comparable vaccines in the U.S. *Id.* at 17-18.

## Analysis

Under Section 13(a)(1)(a), a petitioner seeking an award of compensation for a vaccine injury must demonstrate by a preponderance of the evidence all matters required under Section 11(c)(1). Section 11(c)(1) contains certain jurisdictional requirements, including exceptions that apply when a covered vaccine was not received "in the United States or in its trust territories." Section 11(c)(1)(B)(i)(I) (the first option for satisfying the Act's geographic requirement). Of the two exceptions,[11] only the second is at issue:

[11] The other exception only applies to vaccine receipt by a U.S. citizen who was at the time of vaccination "serving abroad as a member of the Armed Forces or otherwise as an employee of the United States or a dependent of such a citizen." Section 11(c)(1)(B)(i)(II). But it is undisputed that Mr. Padova was not an Armed Forces member at the time of vaccination, employed by the U.S., or a dependent of such a citizen.

> [the injured person] received the vaccine outside the United States or a trust territory and *the vaccine was manufactured by a vaccine manufacturer located in the United States* and such person returned to the United States not later than 6 months after the date of vaccination.

Section 11(c)(1)(B)(i)(III) (emphasis added). This claim undisputedly meets certain of these requirements – Mr. Padova was a longtime American resident and citizen, and he "returned" to the U.S. within six months after the vaccine's administration, under the meaning of Section 11(c)(1)(B)(i)(III). Brief at 1-2; Opp. at 8. Moreover, Fluad constitutes "a covered product under the Vaccine Injury Table." Brief at 6. Thus, Petitioner must only preponderantly demonstrate that the Fluad vaccine dose he received "was manufactured by a vaccine manufacturer located in the U.S." Section 11(c)(1)(B)(i)(III).

That showing must take into account the strict statutory construction "rules" that apply to a statute like the Vaccine Act, which explicitly creates a cause of action against the sovereign. As noted in *Horowitz,* 2024 WL 3665963, at *4,

> [I]nterpretation of a disputed term from the Act should begin with its plain words. *Dupuch-Carron v. Sec'y of Health & Hum. Servs.*, 144 Fed. Cl. 659, 664-65 (citing *Lewis v. U.S.*, 445 U.S. 55, 60 (1980)), *aff'd*, 969 F.3d 1318 (Fed. Cir. 2020); *Sebelius v. Cloer*, 569 U.S. 369, 376-77 (2013) (statutory terms should be construed in light of ordinary meaning). "No single word or phrase should be wrenched from its context and interpreted in a vacuum." *Dupuch-Carron*, 144 Fed. Cl. at 665. And the Federal Circuit has emphasized the importance of avoiding "absurd results" from statutory construction. *Dupuch-Carron*, 969 F.3d at 1330-31 (citations omitted). In addition, because the Vaccine Act creates a basis for a claim against the United States, it "operates as a limited waiver of sovereign immunity," such that "its provisions must be given a 'strict and narrow construction.'" *Dupuch-Carron*, 144 Fed. Cl. at 665, citing *Grice v. U.S.*, 36 Fed. Cl. 114, 120 (1996) Thus, statutory ambiguities must be resolved in the Government's favor. *Holihan v. Sec'y of Health & Hum. Servs.*, 45 Fed. Cl. 201, 208 (1999).

I have previously recognized that the Table itself "does not differentiate between vaccines literally prepared or manufactured within the U.S. versus those abroad..."

*Horowitz*, 2024 WL 3665963, at *4 (citation omitted). Thus, it is conceivable that Section 11(c)(1)(B)(i)(III)'s administration situs exception (allowing U.S. citizens to assert a Program claim despite the fact they were vaccinated out of the country) would permit a claim even though the dose itself had not been in fact produced in the U.S.[12]

But this still means claimants must show that the dose, wherever manufactured, was derived from "a vaccine *manufacturer located* in the United States." Section 11(c)(1)(B)(i)(III) (emphasis added). And this is where Petitioner's arguments fail. For it is clear from the evidence submitted in this case that the Fluad dose received by Mr. Padova was "manufactured" not by Seqirus USA Inc., but SVL/SUK – neither of which are themselves located in the U.S. More of a nexus should be shown between the specific vaccine dose at issue and a U.S.-based entity, *even though* that nexus does not have to be the dose's literal place of manufacture – and that cannot be accomplished on these facts.

In so determining, I do not find Petitioner's analogy to a U.S. company's manufacture of a vaccine in Canada, and that is administered in Canada but to a U.S. citizen, to reflect an "unfair" compliance with the terms of Section 11(c)(1)(B)(i)(III), while in this situation that is not so. *See* Brief at 3; Reply at 4-5, 12-13, 19-20. Petitioner's hypothetical involves "a vaccine *manufacturer located* in the United States" (Section 11(c)(1)(B)(i)(III) (emphasis added)) – consistent with the Act's very definition of manufacturer as "any corporation, organization, or institution . . . which manufactures, imports, processes, or distributes" a covered vaccine (Section 33(3) ("Definitions")). A vaccine dose manufactured in Canada by a U.S. entity exerting control over the manufacture and distribution process is wholly distinguishable from the present case, where non-U.S.-based entities performed *all* of the tasks of manufacturing, importing, processing, and distribution. This Fluad dose was not "manufactured," even in the most liberal sense of being somehow "processed" or "distributed," by a U.S.-based entity.

To evade this outcome, Petitioner offers a construction of Section 11(c)(1)(B)(i)(III) that defines "manufacturer" overinclusively, lumping together all related corporate entities under one single "Seqirus" umbrella. But that definition is not in keeping with the narrow construction of the relevant statutory language that is appropriate for a law creating a

[12] There are still some good arguments that to meet the exception, the dose in question should have been manufactured in the U.S. As Respondent notes, the Act requires claimants to establish that "*the vaccine* was manufactured by a vaccine manufacturer *located in* the United States." U.S. Section 11(c)(1)(B)(i)(III) (emphasis added). Usage of the term "*the* vaccine" is consistent with Congressional concern that a particular vaccine *dose* implicated in a case be shown to have its literal origin in the U.S. *Id.* And to the extent that this phrase is ambiguous, it should be construed in favor of a "dose-specific" inquiry – a strict construction consistent with circumstances in which the government as sovereign consents to suit. *Dupuch-Carron*, 144 Fed. Cl. at 665; *Holihan*, 45 Fed. Cl. at 208.

cause of action against the U.S. *See Soriano v. United States*, 352 U.S. 270, 77 S. Ct. 269, 1 L.Ed.2d 306 (1957) (stating "this Court has long decided that limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied"). It also runs afoul of distinctions between corporate affiliated entities recognized for purposes of jurisdiction. *Bestfoods*, 524 U.S. at 61. Petitioner cannot establish a policy/statutory construction grounds that would defend the proposed conflation between the U.S. Seqirus subsidiary and its UK affiliate (beyond the understandable desire to permit the claim to advance).

I also note that *Horowitz* supports this result (and perhaps even mandates it). In considering a comparable question in *Horowitz,* I allowed for the possibility that a "multinational pharmaceutical company… could be said to be 'located' here" (while simultaneously being able to dispute general jurisdiction, and to use the Act as a shield against vaccine injury claims in a U.S. court). *Horowitz*, 2024 WL 3665963, at *4. But even accepting *arguendo* that Congress was *aware* of multinational pharmaceutical companies when the Act was passed as Petitioner maintains (Reply at 8 n.1), it also was undisputedly focused on stabilizing the *domestic* vaccine market. *Horowitz*, 2024 WL 3665963, at *5; *see* H.R. Rep. No. 908, 99th Cong., 2d Sess., at 7 (1986), U.S. Code Cong. & Admin. News 1986, p. 348 (emphasizing the need "to ensure that the Nation is able to maintain safe and reliable childhood vaccination programs").

Creation of the Act was in no small part motivated by a desire to encourage U.S. manufacturers to *keep* making vaccines (which Congress deemed vital to the Nation's health), in furtherance of existing domestic vaccination policies. *Horowitz*, 2024 WL 3665963, at *5. It concurrently was not "intended to establish a cause of action available to foreign individuals who lacked a domestic nexus" (*id.*)[13] – and thus not only was Section 11(c)(1)(B)(i)(III) drafted to ensure that U.S. citizens only have access to this claim, but that the claim they might bring would arise only in connection with vaccines "manufactured" by U.S. entities, who would be subject to domestic laws and policies – including those pertaining to vaccine manufacture or distribution. *Horowitz,* 2024 WL 3665963, at *5. Where it cannot be demonstrated that "the source of the vaccine was domestic in some fashion," these policy goals will not be met. *Id.* at *5. Thus, the Program reasonably distinguishes between vaccine doses controlled (from a corporate perspective) by a U.S.-based manufacturer from those that completely emanate extra-territorially. Opp. at 14-15 and n.4 (citing *Bestfoods*, 524 U.S. at 61).

[13] Nor does the Act "prevent civil actions against vaccine manufacturers in other countries." *Dupuch-Carron*, 969 F.3d at 1332 (emphasizing the Act's domestic scope).

Petitioner clearly can establish *some* relationship between Seqirus and its U.K. and U.S. affiliates/subsidiaries. And individual entities associated with an otherwise non-U.S.-based company may well produce covered vaccines (even Fluad doses identical to what is at issue) that could be the basis for a Vaccine Act claim in other cases – even where the dose in question was both administered and produced abroad. But that association is not the basis for a finding that a non-U.S. corporate entity that wholly controlled the manufacture, distribution, and production of the vaccine dose at issue constitutes a U.S.-located vaccine manufacturer.

## Conclusion

Because Petitioner has not preponderantly established receipt of a vaccine manufactured by a U.S.-based manufacturer under Section 11(c)(1)(B)(i)(III) of the Vaccine Act, the claim must be **DISMISSED**. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[14] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notice(s) renouncing their right to seek review.